IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

AMTAX HOLDINGS 285, LLC,

    Plaintiff,

v.                                                                  No. 07-cv-1191

OPPORTUNITY BUILDERS, INC., a not-for-profit
development corporation, and
ROBERT TIMOTHY SINGLETON,

    Defendants.

---

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO
LIABILITY AND ORDER OF REFERENCE ON THE ISSUE OF DAMAGES

---

       The Plaintiff, AMTAX Holdings 285, LLC ("AMTAX"), filed a civil action in this Court against Defendants, Opportunity Builders, Inc. and Robert Timothy Singleton,[1] alleging several

---

[1] Singleton is currently a pro se Defendant. The status of his representation and active participation throughout this litigation has not been static.
       According to the affidavit of the process server, Singleton was personally served with the summons and complaint on December 12, 2007 in Montgomery, Alabama. (D.E. 9.) After Singleton had failed to file a responsive pleading, AMTAX moved for entry of default judgment pursuant to Rule 55(a), Federal Rules of Civil Procedure, on January 9, 2008. (D.E. 10.) On January 14, 2008, Singleton filed an affidavit with this Court stating that he intended to defend his case, and an attorney appeared on his behalf. (D.E. 11-13.) Singleton also claimed that his brother, Spence Singleton, would serve as his "lead attorney" in the case, but his brother never made an appearance or filed documents with this Court. (D.E. 12.) The parties agreed that Singleton would have an extension on his responsive pleading, and he answered the complaint on January 24, 2008. (D.E. 19, 24.) On February 21, 2008, Singleton's attorney filed a motion to withdraw, which this Court granted, and the Defendant was given thirty days in which to retain new counsel or provide notification that he intended to represent himself. (D.E. 26-27.) After Singleton failed to respond, the Court entered an order to show cause on April 7, 2008. (D.E. 33.) He responded on May 6, 2008, seeking to proceed pro se and stating that his failure to timely notify the Court was due to a illness in his immediate family. (D.E. 34.)

1

claims related to a low-income property development project in Jackson, Tennessee. The Plaintiff sought declaratory and injunctive relief, liquidated damages, equitable accounting, and contractual damages for breach of a partnership agreement by Opportunity Builders. Also, it alleged breach of a guaranty agreement by both Opportunity Builders and Singleton. In its answer, Opportunity Builders pleaded counterclaims for interference with contract, breach of the duty of loyalty, and breach of contract by AMTAX. On December 1, 2008, the Plaintiff filed a motion for summary judgment on its claim for breach of the guaranty agreement against Singleton only. While this motion was pending, AMTAX and Opportunity Builders submitted a joint motion to dismiss their claims against one another, as the result of a negotiated settlement. Thus, only AMTAX's claims against Singleton remained. After consideration of Plaintiff's motion and Defendant's response, the Court GRANTS AMTAX's motion for summary judgment as to liability and will refer to the Magistrate Judge the issue of damages.

FACTUAL BACKGROUND

Magnolia Landing Apartments, L.P. (the "partnership" or "limited partnership") was a Tennessee limited partnership that owned and operated sixty housing units for low-income families. (Docket Entry ("D.E.") No. 1, Complaint, at ¶ 8.) The housing project qualified for federal low income housing tax credits under 26 U.S.C. § 42.[2] (Id.) According to the restatement of the

---

[2] The stated purpose of the Partnership Agreement was
to acquire, rehabilitate, construct, develop, repair, improve, maintain, operate, lease, dispose of and otherwise deal with the Project in accordance with any applicable Regulations and the provisions of this Agreement. The Partnership shall not engage in any other business or activity.
(D.E. 42, Partnership Agreement, at 17.)

2

partnership agreement, dated January 2, 2003 ("partnership agreement"), the only general partner of Magnolia Landing was Opportunity Builders, a not-for-profit development corporation located in Oakdale, California. (D.E. 1, Complaint, at ¶ 2; D.E. 42, Partnership Agreement, at § 4.01.) AMTAX, an Ohio limited liability company, agreed to buy an interest in Magnolia Landing as a limited partner for a total capital contribution of $2,627,094, which was to be paid in installments.[3] (D.E. 42, Partnership Agreement, at § 4.02(a).) AMTAX would receive 99.99% of any profits or tax credits generated by Magnolia Landing. (Id. at § 6.01(a).) In a separate contract, Magnolia Landing agreed to pay Opportunity Builders a fee of up to $410,500 for services rendered in developing the project. (D.E. 7, Development Agreement, at § 6(a).) As consideration for AMTAX's capital contribution to the limited partnership, Opportunity Builders and Singleton[4] agreed to guarantee Magnolia Landing's "obligations, liabilities or commitments." (D.E. 42, Guaranty, at p.1.) This guaranty applied to a construction loan in the amount of $2,905,000 that had been extended to Magnolia Landing by Sterns Bank National Association on December 23, 2002. (D.E. 1, Complaint, at ¶ 12.)

In accordance with the terms of the partnership agreement, AMTAX paid Magnolia Landing

---

[3]The original limited partner was the Nicholas Group, a Wyoming corporation, which withdrew from the Magnolia Landing partnership as of the January 2, 2003 agreement. (D.E. 42, Partnership Agreement, at § 4.02(c).) Additionally, Protech 2002-D, LLC was designated as a "Special Limited Partner" in the same agreement. (Id. at § 4.02(b).)

[4]Singleton apparently resided in Montgomery, Alabama. (D.E. 1, Complaint, at ¶ 2.) The record contains scant information about this only remaining Defendant. He signed the guaranty agreement in his individual capacity, but the nature of his relationship with the Magnolia Landing project is unclear. In what may amount to a vague clue, the guaranty agreement indicates that he was "either an officer, director, employee, agent, member or shareholder or Affiliate of the Development General Partner or otherwise financially interested in the Development Partnership or the Property of the Development Partnership." (D.E. 42, Guaranty, at 1.)

the first four installments toward its capital contribution.[5] (D.E. 7, Counterclaim, at ¶12.) AMTAX's fifth installment payment, amounting to $919,483, was due no earlier than July 1, 2004, and after the occurrence of all four of the following conditions: "[1] Cost Certification;[6] [2] Initial 95% Occupancy Date and 95% of the units are Tax Credit qualified; [3] Final Closing[7] has occurred; [and] [4] satisfaction of all of the conditions to the payment of the First, Second, Third and Fourth Installments." (D.E. 42, Partnership Agreement, at § 5.01(a)(v) (footnotes added).) AMTAX never paid the fifth installment to Magnolia Landing. (D.E. 7, Counterclaim, at ¶ 13; D.E. 23, Answer to Counterclaim, at ¶13.) In its pleadings, AMTAX denied that satisfaction or waiver of all necessary conditions had occurred, which would have triggered its obligation to pay. (D.E. 23, Answer to

---

[5]The partnership agreement provided that AMTAX would pay $263,709 by December 1, 2002, $131,355 by April 1, 2003, $262,709 by July 1, 2003, and $919,483 by October 1, 2003. (D.E. 42, Partnership Agreement, at § 5.01(a)(i)-(iv).) The agreement also listed several preconditions to the installments coming due. (Id.)

[6]"Cost Certification" is defined in the partnership agreement as
> the date upon which [AMTAX] has received a certification by [Opportunity Builders] of the construction and development costs of the Property and the Eligible Basis of the Property for purposes of Tax Credits, together with a report thereon issued by the Auditors in a form and substance as approved by [AMTAX].

(Id. at p. 5.)

[7]"Final Closing" means
> the date upon which all of the following events have occurred: (i) Permanent Mortgage Commencement, (ii) the Project's being free of any mechanic's or other liens (except for the Mortgage[s] and liens either bonded against in such a manner as to preclude the holder thereof from having any recourse to the Project or the Partnership for payment of any debt secured thereby or affirmatively insured against (in such manner as precludes recourse to the Partnership for any loss incurred by the insurer) by the Title Policy or by another policy of title insurance issued to the Partnership by a reputable title insurance company in an amount satisfactory to Special Tax Counsel (or by an endorsement of either such title policy)), (iii) the disbursement of proceeds under the Permanent Mortgage Loan[s] has been made in the full amount permitted by the Agency, and (iv) all amounts due in connection with the construction of the Project have been paid or provided for.

(Id. at p. 7-8.)

4

Counterclaim, at ¶13.) Opportunity Builders averred that AMTAX's failure to pay the fifth installment inhibited Magnolia Landing from satisfying its financial obligations, including the $410,500 developer's fee.[8] (D.E. 7, Counterclaim, at ¶ 16.)

Magnolia Landing's construction loan, initially due on June 23, 2004, was secured by a Deed of Trust on the real and personal property of the limited partnership. (Id.) Subsequent modifications to the loan extended the due date to July 15, 2006.[9] (D.E. 42, Bric Affid., at ¶ 9.) On March 29, 2007, the construction loan was assigned to Cinco Corporation. (Id.) On April 4, 2007, Cinco Corporation sent Magnolia Landings a letter purporting to be a written notice of default on the construction loan. (D.E. 42, Letter.) It demanded immediate payment of all principal, interest, and late fees on the unpaid loan, which totaled $3,063,165.87. (Id.) As of the filing of the complaint, this amount has not been paid. (D.E. 42, Bric Affid., at ¶ 14.)

To prevent foreclosure, Capmark Affordable Equity, Inc. ("Capmark"), the general managing

---

[8] The development agreement provided that Opportunity Builders would receive its developer's fee from the "Designated Proceeds," which are the
> proceeds of the Mortgage Loans, the Capital Contributions of the Partner(s), any grants to the Partnership, and any insurance proceeds arising out of casualties prior to Final Closing in excess of repairs or capital improvements as well as any rental receipts and other revenues prior to Final Closing in excess of any required operating expenses (including requires reserve and escrow deposits).

(D.E. 7, Development Agreement, at § 6(a).)

[9] Opportunity Builders asserted that, in early 2006, they met with representatives of AMTAX to discuss the converting of the construction loan into a permanent mortgage loan. (D.E. 7, Counterclaim, at ¶ 17.) According to Opportunity Builders, AMTAX agreed to make its fifth installment payment concurrently with conversion of the loan, and part of that money would be allocated toward paying off the balance of the loan. (Id.) Opportunity Builders also claimed that it relied on this promise and attempted to secure a new loan with Sterns Bank, but AMTAX later refused to consent to the conversion. (Id.) AMTAX denied these allegations. (D.E. 23, Answer to Counterclaim, at ¶17.)

partner of AMTAX, purchased the construction note from Cinco.[10] (Id. at ¶ 15.) On April 11, 2007, Capmark sent a letter to Opportunity Builders, accusing it of breaching the partnership agreement by failing to pay the construction loan. (D.E. 1, Complaint, at ¶ 15.) The letter requested that, among other things, Opportunity Builders deliver a report by April 16, 2007, describing how it would cure the default. (Id.) It further advised Opportunity Builders to convert the construction loan to a permanent mortgage loan by April 23, 2007, and concluded by noting that Capmark or AMTAX might seek enforcement of their rights under any of the agreements if Opportunity Builders failed to comply. (Id.)

In a letter dated April 27, 2007, AMTAX accused Opportunity Builders of not addressing the issues raised in the April 16 letter and stated that it was electing to remove Opportunity Builders as general partner of Magnolia Landing because the construction loan was in default. (Id. at ¶ 19.) In support of this action, AMTAX cited section 4.05 of the partnership agreement, which stated that, as a limited partner investor, it had the right

> to remove any or all of the General Partners and elect one or more new General Partners . . . upon the occurrence of any of the following:
> . . . .
> (D) the General Partner shall have caused the Construction Loan or the Permanent Mortgage Loan to go into default[.]

(D.E. 42, Partnership Agreement, at § 4.05(a)(iv)(D).)[11] AMTAX also requested that Opportunity

---

[10]This information is derived from an affidavit of Christopher Bric, who is vice president of Capmark. (D.E. 42, Bric Affid., at ¶¶ 2, 14-15.)

[11]Additionally, section 8.03 of the partnership agreement stated:
If any Terminating Event referred to in Section 8.02 shall occur at a time when there is no remaining General Partner and no successor becomes a successor General Partner pursuant to the preceding provisions of this Section 8.03[,] . . . then the Investor Limited Partner shall have the right to designate a Person to become a successor General Partner upon his or its written agreement to be bound by the

6

Builders pay $20,000 to defray costs associated with selection of a new general partner. (See id. at § 4.05(d).)

On May 2, 2007, Opportunity Builders sent a fax disputing that the partnership agreement gave AMTAX authority to remove the general partner, and, as such, it did not intend to surrender its position in the limited partnership. (D.E. 1, Complaint, ¶ 20; Exhibit E.) On June 20, 2007, AMTAX's counsel wrote Opportunity Builders, referencing an earlier telephone conversation, that stated AMTAX would grant Opportunity Builders sixty days "to cure its defaults and achieve Permanent Mortgage Commencement," and if it failed to do so, AMTAX would "exercise the remedies available to it under the [partnership agreement], at law, and equity, including, without limitation, immediately removing [Opportunity Builders.]" (D.E. 1, Ex. F.) On August 7, 2007, Cinco's counsel sent a letter to Capmark stating that it would be pursuing foreclosure proceedings with regard to the real and personal property of Magnolia Landing because of failure to pay the debt. (D.E. 1, Ex. G.) On October 23, 2007, AMTAX again corresponded with Opportunity Builders stating that it would be removed as general partner of the limited partnership, due to default of the loan, and replaced by an AMTAX affiliate.[12] (D.E. 1, Ex. H.) On November 2, 2007, AMTAX initiated this lawsuit against both Opportunity Builders and Singleton.

---

Project Documents and by the provisions of this agreement.
(D.E. 42, Partnership Agreement, at § 8.03(b).) The partnership agreement includes "removal of a General Partner" within the definition of "Terminating Event." (Id. at p. 16.)

[12]The letter also noted that city and county taxes on Magnolia Landing's property were delinquent for the year 2006. (Id.)

## STANDARD OF REVIEW[13]

Rule 56(c) provides that summary

judgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the Court views the evidence in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Rule 56(e)(1) provides:

A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed. R. Civ. P. 56(e)(1). The United States Supreme Court has instructed that when the motion is supported by documentary proof, such as depositions and affidavits, the nonmoving party may not rest on the pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir.1998). Similarly, Rule 56(e)(2) states:

When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its

---

[13]Singleton cites to Alabama state law concerning summary judgment. Because the standard for deciding summary judgment is a procedural issue, however, this Court applies federal law.

response must–<u>by affidavits or as otherwise provided in this rule</u>–set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(1) (emphasis added). In this case, the Defendant filed a response, but he has not presented any supporting affidavits based on personal knowledge.[14] Additionally, in contravention of the Local Rules of this district, the Defendant has not directly denied the material facts set forth in the Plaintiff's enumerated statement of facts. <u>See</u> L.R. 7.2(d)(3) (requiring a party opposing summary judgment to "respond to the proponent's numbered designations, using the corresponding serial numbering, both in the response and by affixing to the response copies of the precise portions of the record relied upon to evidence the opponent's contention that the proponent's designated material facts are at issue"); <u>see also</u> <u>Akines v. Shelby County Gov't</u>, 512 F. Supp. 2d 1138, 1147-48 (W.D. Tenn. 2007) (stating that failure of a party to follow Local Rule 7.2(d)(3) behooves the Court to "consider the [moving party's] statement of undisputed material facts as having been admitted"). Thus, because Singleton has not contradicted all properly supported factual assertions in the Plaintiff's motion, these facts are taken as true. As such, the Court's standard of review is limited to whether the Plaintiff has presented sufficient affirmative proof to establish that

---

[14]Rule 56(f) provides:
If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1) deny the motion;
(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
(3) issue any other just order.
Fed. R. Civ. P. 56(f). In order to receive additional time for discovery under this Rule, a party must "submit an affidavit setting forth the reasons why [he] cannot fully oppose the motion at this time." <u>Munsey v. Tactical Armor Prods., Inc.</u>, No. 3:07-CV-445, 2008 WL 4500132, at *2 (E.D. Tenn. Sept. 30, 2008). The Defendant never submitted a motion or affidavit stating that he could not present–or needed more time to elicit–facts essential to respond to the Plaintiff's dispositive motion.

there is no genuine issue as to any material fact necessary to establish its prima facie case.

CHOICE OF LAW

The Court will apply state, rather than federal, law to the parties' issues of contract construction because subject matter jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). The guaranty agreement at the center of the controversy contains a choice of law provision that designates Tennessee law as controlling. (D.E. 42, Guaranty, at 4-5.) AMTAX's memorandum cites to Tennessee law, but Singleton relies exclusively on case law from other jurisdictions. Tennessee's choice of law rule provides that contracts are presumed to be governed by the laws of the jurisdiction in which they are executed unless the parties manifest a contrary intent. Messer Griesheim Indus., Inc., v. Cryotech of Kingsport, Inc., 131 S.W.3d 457, 474-75 (Tenn. Ct. App. 2003) (citing Ohio Cas. Ins. Co. v. Travelers Indem. Co., 493 S.W.2d 465, 467 (Tenn. 1973)). When parties include a choice-of-law provision in their contract, it will be honored if certain requirements are met:

> The choice of law provision must be executed in good faith. The jurisdiction whose law is chosen must bear a material connection to the transaction. The basis for the choice of another jurisdiction's law must be reasonable and not merely a sham or subterfuge. Finally, the parties' choice of another jurisdiction's law must not be "contrary to 'a fundamental policy' of a state having [a] 'materially greater interest' and whose law would otherwise govern."

Messer, 131 S.W.3d at 475 (internal citations omitted). In this case, Tennessee bears a reasonable and material relation to the guaranty agreement because Magnolia Landing is a Tennessee limited partnership, and it appears that a majority of its assets and business operations are located in Tennessee. Additionally, nothing in the record suggest that the choice of Tennessee law was a sham

10

or subterfuge or in bad faith. Thus, this Court holds that the choice-of-law provision is valid and will apply Tennessee law.

ANALYSIS

AMTAX seeks damages from Singleton's alleged breach of their guaranty agreement. A guaranty is a special type of contract in which "the guarantor agrees to satisfy the debt of another . . . , only if and when the debtor fails to repay . . . ." Midwest Guar. Bank v. Guar. Bank, 270 F. Supp. 2d 900, 911 (E.D. Mich. 2003) (quoting Black's Law Dictionary 705 (6th ed. 1990)). It is considered to be an agreement collateral to a primary loan obligation and "binds the guarantor to performance in event of nonperformance by the principal obligor." Jones Motor Co. v. Teledyne, Inc., 690 F. Supp. 310, 313 (D. Del. 1988) (citing Gen. Overseas Films, Ltd. v. Robin Intern., Inc., 542 F. Supp. 684 (S.D.N.Y. 1982)). Under the terms of the guaranty agreement at issue, Singleton agreed to "absolutely and unconditionally, guarantee to [AMTAX] payment when due, whether by acceleration or otherwise, of an amount equal to any and all amounts due from [Opportunity Builders] or from the Developer to [AMTAX] or to fund [Magnolia Landings] obligations, liabilities or commitments the responsibility for which is with [Opportunity Builders] or the Developer . . . ."[15] (D.E. 42, Guaranty, at 1.)

Guaranty agreements, like other contracts, "are to be construed according to the ordinary

---

[15]The Court is unable to discern from any of the documents in the record whom the term "Developer" refers to. AMTAX is designated as "Investor Partner;" Opportunity Builders is the "Development General Partner;" Magnolia Landing is the "Development Partnership;" and Opportunity Builders and Singleton are collectively referred to as "Guarantor." Applying the process of elimination, one might conclude that Singleton is the "Developer," but that is unclear from the face of the guaranty agreement.

meaning of the wordage used and with the view to carry out the intent as therein expressed." First Nat'l Bank v. Foster, 451 S.W.2d 434, 436 (Tenn. Ct. App. 1969). "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." Maggart v. Almany Realtors, Inc., 259 S.W.3d 700, 703-04 (Tenn. 2008) (quoting Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc., 521 S.W.2d 578, 580 (Tenn. 1975)). The intent of the parties is presumed to be that expressed in the body of the contract. Kafozi v. Windward Cove, LLC, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005). Courts should consider the contract in its entirety, and the court's interpretation should give reasonable meaning to all provisions therein. Maggart, 259 S.W.3d at 704 (citing Davidson v. Davidson, 916 S.W.2d 918 922-23 (Tenn. Ct. App. 1995)). "If the language of a written instrument is unambiguous, the Court must interpret it as written, rather than according to the unexpressed intention of one of the parties." Sutton v. First Nat'l Bank of Crossville, 620 S.W.2d 526, 530 (Tenn. Ct. App. 1981). A dispute among the parties regarding the interpretation of a contract does not in itself make the contract ambiguous. Campora v. Ford, 124 S.W.3d 624, 627-628 (Tenn. Ct. App. 2003) (internal citations omitted). Further, the Court may not create an ambiguity where none exists. Id.

Additionally, Tennessee courts have referred to guaranties in commercial contracts as "special contracts." Suntrust Bank v. Dorrough, 59 S.W.3d 153, 156 (Tenn. Ct. App. 2001). "In order to facilitate the extension of credit, Tennessee does not favor guarantors and will construe a guaranty against the guarantor as strongly as the language will permit."[16] Id. (citing Squibb v.

---

[16]Given that the stated policy behind construing a guaranty against the guarantor is to promote the "extension of credit," this principle is arguably less applicable to the transaction underlying this dispute, considering that AMTAX, the guarantee under the agreement, was not

12

Smith, 948 S.W.2d 752, 755 (Tenn. Ct. App. 1997)); see also Bright v. McKnight, 33 Tenn. (1 Sneed) 158, 168 (1853) (stating that "the words of the guaranty are to be taken as strongly against the guarantor as the sense will admit").

In its motion for summary judgement, AMTAX refers to Singleton's guaranty for the obligations of Magnolia Landings and observes that this agreement would cover the construction loan of $2,905,000. (D.E. 42, Mot. for S.J., at 2-3.) This loan, after a series of modifications, was made due and payable on July 15, 2006, but was not paid on or before that date. (Id. at 3.) On April 4, 2007, the company that owned the loan issued a default notice, threatened foreclosure, and demanded payment of the principal, interest, and late fees, which totaled $3,063,165.87. (Id.) AMTAX argues that Singleton failed to cure the limited partnership's default under the construction loan, per the guaranty agreement, and this caused it to incur late charges and penalties. (Id.) Thus, AMTAX claims Singleton breached the unambiguous terms of the guaranty agreement and should be held liable for damages caused by his breach,[17] as well as attorneys' fees, disbursement and expenses, and other reasonable costs associated with enforcing the guaranty. (Id. at 3-4.)

AMTAX must establish three essential elements as part of its prima facie case for liability: "(1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the

---

extending credit in the traditional sense. Suntrust Bank, 59 S.W.3d at 156. Rather, the guaranty was given in consideration for a capital contribution to Magnolia Landing. (D.E. 42, Guaranty, at p.1.) However, this transaction is analogous to the extension of credit in that the guarantors apparently offered the guaranty in order to obtain an infusion of cash for the limited partnership, and AMTAX bargained for the guaranty to protect a return on its investment. (Id.) While the parties to the guaranty agreement in this case are not in a traditional debtor-creditor relationship, the policy goals, underlying the principles articulated in Suntrust Bank and other such cases, are no less relevant.

[17]AMTAX insists that $705.68 in interest continues to accrue on the unpaid balance of the construction loan. (D.E. 42, Mot. for S.J., at 4, 6.)

breach." Life Care Ctrs. of Am. v. Charles Town Assocs. Ltd. Ptnr., 79 F.3d 496, 514 (6th Cir. 1996); ARC Lifemed, Inc. v. AMC-Tenn., Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). There is apparently no dispute between the parties as to the existence of the contract, and AMTAX attached a copy of the guaranty agreement to an affidavit submitted with its summary judgment motion. (D.E. 42, Guaranty (attached with Bric Affid.).) The facts summarized above, which AMTAX supported with the requisite documentary evidence, ostensibly establish that Singleton breached the terms of the guaranty agreement by not satisfying the defaulted construction loan. Although he has presented no documentary proof in rebuttal, Singleton argues that AMTAX has not proven a breach. In particular, he argues that AMTAX's removal of Opportunity Builders as the general partner was not permitted under the other applicable agreements, namely the limited partnership agreement, and this constituted a material change of the overall "deal." (D.E. 47, Response, at 6.) Singleton argues that removal of the general partner prevented him from working with or benefitting from the Magnolia Landing partnership; thus, this material alteration in the guaranty agreement and related documents, without his consent, had the effect of discharging him.[18] (Id. at 7 (citing Continental Ozark, Inc. v. Lair, 779 S.W. 2d 187 (Ark. Ct. App. 1989); Royal Banks of Mo. v. Fridkin, 819 S.W.2d 359 (Mo. 1991).)

Tennessee recognizes a distinction between absolute or unconditional guaranties and conditional guaranties. See Hassell-Hughes Lumber Co. v. Jackson, 33 Tenn. App. 477, 232 S.W.2d 325 (Tenn. Ct. App. 1949). An absolute guaranty is "an unconditional undertaking on the part of the guarantor that the person primarily obligated will make payment or will perform, and such a

---

[18]Singleton fails to cite any authority from Tennessee statutory or case law in support of his argument. (See D.E. 47, Response, at 5-9.)

14

guarantor is liable immediately upon default of the principal without notice," but, in a conditional guaranty, the guarantor's liability depends on the occurrence of some extraneous event, such as when "payment or performance cannot be obtained from the principal obligor by reasonable diligence." United States v. Willis, 593 F.2d 247, 254 (6th Cir. 1979) (quoting Pavlantos v. Garoufalis, 89 F.2d 203, 206 (10th Cir. 1937)). Based on the clear language of the guaranty agreement, construed against the guarantor, the Court finds that the parties intended to enter into the an absolute guaranty. The agreement contains no explicit conditions to the obligations, and states that the guarantors "absolutely and unconditionally" guarantee payment when due. (D.E. 42, Guaranty, at 1.) Thus, the unambiguous terms of the contract indicate that Singleton's liability was contingent only upon default by the principal debtor, Magnolia Landings. "An absolute and continuing guaranty may be cancelled or terminated only as stated in the guaranty or by the acceptance of a new guaranty as a replacement for the prior one." First Am. Nat'l Bank v. Hall, 579 S.W.2d 864, 868 (Tenn. Ct. App. 1978). Tennessee courts have noted that this strict rule does not create injustice because, at the time of contracting, "it is in the power of guarantors to make their obligation dependent upon notice, demand, or any other condition they see proper, for their own protection and safety." Hassell-Hughes Lumber, 232 S.W.2d at 329. Nothing in these parties' guaranty agreement or the underlying partnership agreement stated that AMTAX's ouster of the general partner, whether rightly or wrongly, would discharge the obligations of the guarantors. In accordance with Tennessee law, this Court will not insert such a term into the contract. See Alcazar v. Hayes, 982 S.W.2d 845, 853 (Tenn. 1998) (observing the "axiom proscribing judicial alteration of the terms of an unambiguous contract"); Ward v. Glover, 206 S.W.3d 17, 28 (Tenn. Ct. App. 2006) (stating that an "unambiguous contract must be interpreted as written rather than according

15

to the unexpressed intention of one of the parties"). Thus, there is no merit to Singleton's contention that his obligations under the guaranty agreement were somehow discharged or excused by the removal of Opportunity Builders as general partner.[19]

Considering that Singleton has pointed to no facts and presented no proof rebutting AMTAX's prima facie showing of a breach,[20] the Plaintiff has established the second element of its claim. See Life Care Ctrs., 79 F.3d at 514. The third and final element is the existence of damages, which Singleton disputes. The Defendant likewise has presented no proof that rebuts the Plaintiff's assertion that the breach caused damages, which was supported by the affidavit of the vice president of the corporation serving as the managing general partner of AMTAX. (D.E. 42, Bric Affid., at ¶¶ 17, 19.) Because Singleton has not shown that there is a dispute for trial with regard to whether his breach caused damages, AMTAX has established the final element of its claim and is entitled to summary judgment.[21]

---

[19]Singleton also argues that there is an issue of fact with regard to whether foreclosure occurred. (D.E. 47, Response, at 3.) However, there does not seem to be a factual dispute as to the question of foreclosure because both parties agree that it did not occur. (See id.; (D.E. 42, Bric Affid., at ¶ 15.) Regardless, this factual question would not be material to whether Singleton is liable because whether or not Cinco foreclosed under the deed of trust, the obligation to pay deficiencies under the guaranty agreement would not have been alleviated. See Klein v. Kern, 94 Tenn. 34, 28 S.W. 295, 296 (1894) (stating that "[i]t is well settled in Tennessee that when the guaranty is absolute no demand or exhaustion of the maker is required").

[20]Singleton argues that there exists a material issue of fact with regard to the "interpretation and application of the terms" of the various agreements. (D.E. 47, Response, at 3.) This contention does not preclude summary judgement. For one, Singleton has failed to point specifically to any language in the agreements that is in dispute. More importantly, contract interpretation generally involves questions of law, especially where the terms are unambiguous. Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999).

[21]Singleton also states that there is an issue of fact with regard to the Court's jurisdiction, though he does not specify whether personal or subject matter. At this point, any objection that Singleton may have had with regard to personal jurisdiction has been waived for failing to raise

16

After reviewing the proof presented by AMTAX, however, the Court is unable to ascertain the precise amount of the loss caused by Singleton's breach. AMTAX points to the balance and rate on the loan, as well as the clause in the agreement providing for reasonable expenses and attorneys' fees, but it is unclear what amount of damages directly arose from Singleton's failure to honor the default. Rule 56(d)(2) permits that "[a]n interlocutory summary judgement may be rendered on liability alone, even if there is a genuine issue on the amount of damages." Fed. R. Civ. P. 56(d)(2). As such, the Court grants AMTAX's motion for summary judgment on its breach of contract claim, but not on the calculation of damages.

## CONCLUSION

For the reasons articulated herein, the Court **GRANTS** the Plaintiff's motion for summary judgment on the issue of liability, but reserves its ruling on the issue of damages. For purposes of determining the damages sustained by the Plaintiff, the Court REFERS the matter to the Magistrate Judge for a hearing and report and recommendation on that issue.

IT IS SO ORDERED this 9th day of February, 2009.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

it earlier. Also, he cites no facts that would call into question this Court's subject matter jurisdiction based on diversity of the parties. 28 U.S.C. § 1332.